# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:09cv101

| | | |
|---|---|---|
| **NASEEM AHMED,** *et al.*, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **ANTHONY PORTER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with 28, United States Code, Section 636(b), and upon the following motions:

(1)    Motion to Stay Proceedings and to Compel Arbitration (#11) filed by defendant United Community Bank;

(2)    Joint Motion to Dismiss Claims of Michael and Donna Stead Against Defendant Carolina First Bank (#76);

(3)    Motion to Dismiss, Motion for More Definite Statement, Motion to Sever (#82) filed by defendant Secor Group, LLC; and

(4)    Plaintiffs' Motion to Convert Defendant Secor's Motion to Dismiss to Summary Judgment Motion and Permit Discovery Sufficient to Respond to Defendant's Motion (#89).

On April 29, 2009, oral arguments were heard on such motions and parties interested in the outcome of such motions were present and heard from.[1]

At the commencement of the hearing counsel for the respective parties present reported that Motion to Stay Proceedings and to Compel Arbitration (#11) was amicably resolved, that the mediation was completed, and that a final award from the mediator was presently expected. Without objection, the undersigned will recommend that such motion be denied as moot. The parties further reported that the Joint Motion to Dismiss Claims of Michael and Donna Stead Against Defendant Carolina First Bank (#76) has been amicably resolved and that the claims asserted by such plaintiffs against such defendant will be pleaded out in accordance with the instructions contained in Gahagan v. North Carolina Hwy. Patrol, 1:00cv52 (W.D.N.C. Oct. 25, 2000). The court will recommend that any such parties who have settled their claims amicably be granted leave to amend the pleadings to delete claims made by such plaintiffs against such defendants.

After such motions were addressed, the court heard arguments as to the Motion to Dismiss, Motion for More Definite Statement, Motion to Sever (#82) and Plaintiffs' Motion to Convert Defendant Secor's Motion to Dismiss to Summary Judgment

---

[1] See Docket Report for Orders excusing parties who expressed no interest in the outcome of such motions. While they received actual notice, none of the *pro se* plaintiffs appeared and none were excused.

Motion and Permit Discovery Sufficient to Respond to Defendant's Motion (#89). The remainder of this Memorandum and Recommendation will be directed to such unresolved motions.

## FINDINGS AND CONCLUSIONS

## I.    Factual Background[2]

## A.    The Parties

This action concerns a residential real estate development in Mitchell County, North Carolina named the *Village of Penland* (hereinafter "VOP"). Plaintiffs complain that they were victims of an unlawful investment scheme wrought by the Developer Defendants,[3] who were either aided and abetted or conspired with the Promoter Defendants[4] as well as other defendants both known and unknown.[5] The moving defendant Secor Group LLC (hereinafter "Secor") is identified as being a

---

[2]    The following factual background is drawn from the First Amended Complaint and is intended to aid the decision- making process as to the motions now before the court. Such summary is not intended to bind the parties or the court. The court notes that there are two First Amended Complaints, and that the court deems the February 2008 First Amended Complaint to be the operative document.

[3]    The Developer Defendants are identified in the First Amended Complaint at ¶¶ 71-80.

[4]    The Promoter Defendants are identified in the First Amended Complaint at ¶¶ 81-85.

[5]    The other defendants include the Lender Defendants, identified in the First Amended Complaint at ¶¶ 86-88, and the "John Doe" Defendants, described in ¶ 89.

member of the Promoter Defendants. First Amended Complaint, at ¶ 81.[6] Plaintiffs allege that Secor is a Charlotte based regional real estate firm that, among other services, helps individuals find "second homes" or other properties to purchase as investments. Id.

**B.     The Alleged Scheme**

As to the alleged investment scheme, plaintiffs contend that the Developer Defendants and John Doe Defendants conceived and orchestrated the scheme, but that "[a]ll defendants jointly implemented and carried out the Investment Scheme." Id., at ¶ 91. Plaintiffs contend that the Developer Defendants purchased 1200 acres of land in Mitchell County in 2002, eventually subdividing such land (and, perhaps, some additional tracts) into 2000 lots. Id., at ¶ 92. Such subdivision of the land into 2000 lots was then, allegedly, organized into smaller subdivisions operated by one of the Developer Defendants' "horizontal development companies." Id., at ¶ 104. Despite such further division, plaintiff contend that the "property was part of one common investment and promotional scheme." Id.

The plaintiffs' contend that these lots were the centerpiece of an investment scheme they allege to be governed by the securities laws of the State of North

---

[6]     Secor is also alleged to have been doing business as Southgroup Realty and Southgroup Real Estate Investments. The court will hereinafter simply refer to the only legal entity, Secor.

Carolina.  Id., at ¶ 105.  They allege that the scheme was designed as a means to entice investors to invest from between $125,000.00 and $250,000.00 per investment lot, with the funds raised through mortgage loans secured from local and regional lenders, to be remitted to the Developer Defendants.  Id., at ¶ 105(A).  They contend that they were enticed into an investment scheme which required investment in a common enterprise, inasmuch as the success of the investors was dependent on the "Defendants to develop, market, sell and maintain the common scheme . . . ."  Id., at ¶ 105(B).  Further, they contend that they were enticed to "rely solely upon the efforts of the Defendants to develop, market, sell, and maintain the investment lots and the enterprise. . . ."  Id., at ¶ 105(C).

Plaintiff also allege that such scheme was facilitated and made possible by the involvement of "various individuals," including the same appraiser[7] (defendant A. Greg Anderson) who allegedly was utilized by "defendants" and who overvalued the lots.  Id., at ¶¶ 107-108.  Plaintiffs contend that "Defendants utilized the same" appraiser and that such appraiser was "secured by the Lender Defendants."  Id., at ¶¶ 107 & 109.  Plaintiffs contend that they relied on these "flawed appraisals" as they

_____

[7]        Plaintiff uses the term "assessor," which is a term commonly used in North Carolina real estate parlance to refer to a county tax authority.  In North Carolina, the private party who values real property for purchasers and lenders is known as an "appraiser," and the undersigned will use such term to avoid confusion.

were a "critical component" in inducing them to participate in the investment scheme. Id., at ¶ 109. It is plaintiffs' contention that the Developer Defendants and the Lender Defendants entered into mortgage loan commitments based on appraisals they knew to be flawed. Id., at ¶ 111.

## C. Closing the Deals

Plaintiffs next contend that after they were enticed into participation in the investment, the transaction was completed through the use of a two-step loan closing process: first, financing was secured with the Lender Defendants in a loan process that was originated, facilitated, and arranged by the Developer Defendants, id., at ¶ 112; and second, two incentives were given back to the purchaser at closing: a lease of the lot back to the developer for two years with the developer carrying the note, and the conveyance of a two year option for the developer to repurchase the lot. Such incentives also came with a personal guaranty from certain individual developer defendants. Id. Plaintiffs allege that the entire scheme was given an "air of legitimacy" by and through the involvement and association in the scheme of numerous professionals, including the Lender Defendants and Promoter Defendants. Id., at 113.

### 1. Step One

Plaintiffs contend that the Developer Defendants employed unlicensed

mortgage brokers, who walked them through the loan process with the Lender Defendants. Id., at ¶ 114. The Lender Defendants are alleged to have had little to no interaction with plaintiffs. Id. Not only is it alleged that the Developer Defendants used their close relationship with the Lender Defendants as part of the sales pitch, id., at ¶ 115, they also purportedly had such close ties with the Lender Defendants as to be able to close on sales contracts within a few days of the sale or even secure the financing and close on the property via a power of attorney without the purchaser ever signing any transactional documents. Id., at ¶¶ 116-117. Plaintiffs allege that the domination of the transactional aspects by the Developer Defendants was so complete that they advised plaintiffs that they would contact the lender for the investor, pay all fees and costs, and then pay all interest on the loans as well as property taxes. Id., at 118.

Plaintiffs also contend that the scheme involved purchasers securing up to 80 percent of the purchase price from the Lender Defendants, and the remaining 20 percent from a bogus financing company which would supposedly remit the 20 percent to the Developer Defendants. Id., at 119-120. Plaintiffs allege that such 20 percent loan was a sham with a non-existent finance company, and that the only actual loan secured was from the Lender Defendants. Id., at ¶ 120.

After all the loan documents required by the Lender Defendants were

assembled by the Developer Defendants (by and through employees of the developer called "Loan Coordinators"), the loans were then closed by one local attorney or an employee of the Lender Defendants who would often fly to the homes of the purchasers to close the loan. Id., at ¶¶ 124-125. Sometimes, closing were accomplished through use of the mails alone. Id., at 125.

## 2. Step Two

The second step of the closing involved the Developer Defendants  making good on a number of the enticements for participation in the investment scheme.  At or about the time of the closing, the first element of the second step would occur: plaintiffs would lease back the lot they had just purchased to one of the "horizontal development companies" created by the Developer Defendants.  In the lease agreement, such company would agree to lease the lots for up to two years for an amount equal to plaintiff's mortgage payment for that period. Id., at ¶ 126. Such supposed lease payments/loan payments were then handled in one of three ways:

(1) the purchaser received a lump sum for the two years and was responsible for paying the sums to the bank;

(2) the Developer Defendants would make the payments as they became due on a monthly basis; or

(3) the money would be paid into an account controlled by the Developer

Defendants upon which the Lender Defendants could make monthly draws.

Id., at ¶ 127.   As the two year "lease periods" would expire, the Developer Defendants would often extend the lease and continue to make payments, and by 2007, the developer defendants were paying the debt service on over $80,000,000.00. Id., at ¶ 128.

In addition to the lease, the second element of the second step of the closing involved an option which was executed in favor of the Developer Defendant's horizontal development company.  This option afforded the Developer Defendants' the opportunity to repurchase the lot at the outstanding principal balances of the loans (plus the supposed accrued   interest on the second loan).   Id., at ¶ 129.   In consideration for conveying the option, the investors were paid a percentage of the option sale price up front.[8]  Id.  Plaintiffs allege that the option aspect of the scheme prevented them from reselling the lots to third parties.  Id., at ¶ 130.

Plaintiffs also allege that the Developer Defendants' loan coordinators, with

---

[8]       The court has drawn from such allegations that at the time of closing, plaintiffs tendered 80 percent of the purchase price to the Developer Defendants and gave the Lender Defendants a promissory note and deed of trust for such amount.  From such funds, the Developer Defendants gave back to plaintiffs at or around the time of closing a substantial portion of the so called "option" repurchase price and in many cases the first two years mortgage payments, denominated lease payments.  According to exhibits annexed to the First Amended Complaint, plaintiffs received back at closing nearly eight percent of the purchase price, which was, of course, their own money.

assistance from the Lender Defendants, secured balloon notes for the investors. Id., at ¶ 131. They contend that representations were made that such notes would be paid off by the Developer Defendants as they exercised the options and the real property was repurchased.[9] According to plaintiffs, most of these balloon notes matured at about the same time. Id.

Plaintiffs allege that the third element of the second step of the closing process was a personal guaranty by individual developer defendants.[10] Allegedly, these individuals misrepresented their net worth in bogus financial statements. Id., at ¶ 132. According to plaintiff, legitimacy was added to the scheme inasmuch as the Developer Defendants in fact made payments on behalf of the investors for several years, all with the knowledge of the Lender Defendants. Id., at ¶ 118.

Plaintiffs also allege that the Developer Defendants obtained a legal opinion letter from the law firm of *Womble, Carlyle, Sandridge & Rice* concerning the legality of the documents used in the investment scheme, but that such letter was qualified by a number of disclaimers particularly as to securities law, disclosures for interstate land sales, and laws governing the solicitation of investments. Id., at ¶ 135.

---

[9]      The court notes that an "option" is simply that - - it does not require the holder of the option to do anything.

[10]      While plaintiffs allege that personal guaranties were made, they do not allege whether the guaranties were made in favor of plaintiffs, the Lender Defendants, or the Developer Defendants. See id., at ¶ 117.

**D.    The Promoters**

Plaintiffs contend that the Developer Defendants originally took on the task of marketing.  Id., at ¶ 137.  They allege that the introduction of new investors and the capital they would bring was crucial to keeping the scheme going and staving off collapse.  Id., at ¶ 138. In addition to marketing efforts by the Developer Defendants, id., at ¶¶ 138-141, plaintiffs contend that the Developer Defendants also entered into marketing partnerships with the Promoter Defendants.

**1.    Source One**

One of these alleged marketing partners was Source One, which allegedly claimed in  marketing materials distributed to investors to be involved in a "joint marketing venture with The Communities of Penland, LLC (COP) . . ." and the Developer Defendants.  Id., at ¶ 142.  According to plaintiffs, Source one described the opportunity to purchase lots as "Private Capital Placement," an "investment vehicle," and their "newest investment opportunity."  Id., at ¶ 145.  Plaintiff also contends that in addition to marketing material, Source One also made presentations to potential investors promoting the benefits of "investing" in the VOP scheme.  Id., at 146.  At one sales event open to the public, Source One allegedly touted the lease incentive of the scheme as a sales incentive, showed potential investors lots that were platted and mapped over land not owned by the investors, and handed out brochures

containing false or misleading information. Id., at ¶ 147-152. Such event was allegedly attended by representatives of the Lender Defendants. Id., at ¶ 153. It is also alleged that Source One absorbed transportation costs for potential investors, including private aircraft, but required such potential investors to sign a "Letter of Intent," wherein they signified that they "expressed the interest and intent to take action to become part of the Investor Program . . . ." Id., at 154. According to plaintiffs, the Developer Defendants and Source One each contributed funds for the development of promotional materials used at the sales event. Id., at ¶ 155. Plaintiffs further allege that Source One assured certain plaintiffs that Source One backed the Developer Defendants "100%" and accepted responsibility for carrying out any promises made by the Developer Defendants would could not be fulfilled, id., at ¶ 156, and at times Source One paid the incentive lease and option payments to some investors. Id., at ¶ 157. Plaintiffs contend that such actions by Source One were intended to and did cause plaintiffs to participate in the scheme. Id., at ¶ 158.

### 2. Secor

Inasmuch as the allegations concerning Secor are at issue in the pending Motion to Dismiss, the court has paid particularly close attention to the allegations relevant to Secor's alleged conduct.

Plaintiffs allege that Secor, another Promoter Defendant, engaged in direct

marketing to potential investors through "Dear Investor" letters.  Id., at ¶ 159.

Plaintiffs contend that Secor marketed the lot sales as "investments" and made

misrepresentations in such correspondence and promotional materials, including

misrepresentations concerning: (1) the project being a "fully permitted project that

covers over 1600 acres" when it was not; (2) that investors could receive an

"estimated 2.5-3 million dollar return within five years";  and (3) that "Bank of

America is involved with over $50 million invested" when they had invested nothing.

Id.  Plaintiffs contend that in other communications, Secor touted VOP as "an

AMAZING project" and that "[w]hat I found is going to be a gold mind [sic] and

depending on where you are at with your debt to income there are guaranteed returns

of 2.5 million for qualifying for a 500k loan with no money out of pocket."  Id., at

¶ 160.

Plaintiffs contend that such actions by Secor were intended to and did cause

plaintiffs to participate in the scheme.  Id., at ¶ 161.  They further contend that Secor,

as agents for certain (but unnamed) plaintiffs, owe them a "duty of good faith, full

disclosure, and reasonable care, skill and diligence."  Id., at ¶ 162.

### E.    The Lenders

Plaintiffs allege that both the Promoter Defendants and the Developer

Defendants enlisted the assistance of the Lender Defendants, who "materially,

knowingly, and voluntarily participated in the perpetuation of the Investment Scheme." Id., at ¶ 163. Not only do plaintiffs allege that the Lender Defendants participated in the scheme, the Lender Defendants knew full well that the plaintiffs were putting no money down, were receiving cash back at or around the time of closing, and that loan applications were submitted to multiple lenders. Id., at ¶ 165. Plaintiffs contend that the Lender Defendants knew such details of the investment scheme at the same time they made public statements to the effect that the investors were "active participants" in a criminal "scheme to defraud the banks." Id. See also id., at ¶¶ 165-169. Plaintiffs contend that the Lender Defendants continued to participate in the scheme even after receiving correspondence from the Developer Defendants which laid out the details of the scheme, including the fact that the buyers were not putting any cash down and were receiving cash back or "incentives" at closing. Id., at ¶¶ 168-172.

Plaintiffs also allege that the Lender Defendants were complicit in the scheme inasmuch as they allowed the Developer Defendants to make loan payments for plaintiffs and other investors. Id., at ¶¶ 179-180. Further, plaintiffs allege that at least one Lender Defendant noted in a creditor letter that the late payment attributed to one investor was not the investor's fault "due to payments being made by a developer thru an agreement with this customer." Id., at ¶ 182. Plaintiffs further

allege complicity through the Lender Defendants' use of the Developer Defendant's appraiser. Id., at ¶¶ 183-195, and that the Lender Defendants knew that the values appraised were inflated. Id., at ¶ 196.

Plaintiffs also allege that the Lender Defendants willingly worked with the Developer Defendants' unlicensed mortgage brokers called "Loan Coordinators." Id., at ¶ 197. Further, plaintiffs list the lending failures of the Lender Defendants, id., at ¶ 202, and its failure to follow the progression of the development (or lack thereof) through site visits even though the lenders had local offices. Id., at ¶ 203. Plaintiffs contend that they relied on the credibility and experience of the Lender Defendants in ultimately deciding to invest in the scheme. Id., at ¶ 207. Finally, they contend that without the Lender Defendants, which served as the sole sources of funds, "the Investment Scheme could not have been implemented." Id., at ¶ 209.

## F.    The Scheme Collapses

In May 2007, the Developer Defendants sent many of the plaintiffs a letter via email informing them that they could no longer make the monthly payments. Id., at ¶ 210. The following month, the Attorney General of North Carolina filed suit against the Developer Defendants alleging that they had engaged in unfair and deceptive conduct. The Superior Court of Wake County, in which suit was filed, appointed a receiver to take over the affairs of the Developer Defendants. Id., at ¶

211.

## II.    The Plaintiffs' Causes of Action

Plaintiffs have alleged the following causes of action:

(1)    Failure to Register a Security (State Law Violation), asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;[11]

(2)    Securities Fraud (State Law Violation), asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(3)    Violation of the N.C. Investment Advisers Act, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(4)    Common Law Fraud, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(5)    Fraud in the Inducement, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(6)    Constructive Fraud, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(7)    Breach of Fiduciary Duty, asserted by all plaintiffs against the

---

[11]    The court has not and will not include claims which the parties have represented have been amicably resolved.

Developer, Promoter, UCB and John Doe Defendants;

(8) Negligent Misrepresentation, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(9) Conversion, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(10) Breach of Contract, asserted by all plaintiffs against the Developer Defendants;

(11) Violation of the Unfair and Deceptive Trade Practices Act, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(12) Violation of the Mortgage Lending Act, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(13) Civil Conspiracy, asserted by all plaintiffs against the Developer, Promoter, UCB and John Doe Defendants;

(14) Breach of Surety Agreement, asserted by all plaintiffs against Defendant Porter;

(15) Breach of the Covenant of Good Faith and Fair Dealing, asserted by all plaintiffs against Defendant Porter;

(16) Negligence, asserted by all plaintiffs against the Developer, Promoter,

UCB and John Doe Defendants; and

(17)   Defamation, by all plaintiffs against defendant UCB.

## III.   Plaintiffs' Motion to Convert Defendant Secor's Motion to Dismiss to Summary Judgment Motion and Permit Discovery Sufficient to Respond to Defendant's Motion (#89).

Secor has filed a Motion to Dismiss, Motion for More Definite Statement, [and] Motion to Sever.   In support of such motion, however, Secor has submitted evidentiary material that is outside the pleadings, including at least one affidavit that has not been subjected to the adversarial process.   Such material may be summarized as reflecting the opinion of Secor that it was not complicit in the scheme and was itself a victim of the Developer Defendants.   While it is possible that Secor was simply a dupe, such a conclusion simply cannot be drawn from self serving affidavits and other, perhaps selective, evidentiary material submitted.   If plaintiffs have in fact stated causes of action against Secor, they have the right to explore all the materials that may be in Secor's possession as well as probe and confront the officers of such corporation as to what in fact was said, agreed to, and actually done.   The court has, therefore, disregarded all material submitted outside the pleadings and exhibits thereto in considering Secor's motions.   For that reason, the undersigned will recommend that plaintiffs' Motion to Convert Defendant Secor's Motion to Dismiss to Summary Judgment Motion and Permit Discovery Sufficient to Respond to

Defendant's Motion (#89) be denied without prejudice.

**IV.    Secor's Motion to Dismiss, Motion for More Definite Statement, [and] Motion to Sever (#82).**

### A.    Introduction

In moving to dismiss, Secor contends that it is entitled to dismissal of all claims asserted against it in the First Amended Complaint pursuant to Rules 9(b), 12(b)(1), and 12(b)(6), Federal Rules of Civil Procedure.  Secor then seeks, in the alternative, a more definite statement of the claims asserted against it and then to sever all plaintiffs who cannot allege a reasonable connection to Secor.  Fed.R.Civ.P. 12(e), 20, & 21.  Review of the First Amended Complaint reveals that Secor is a defendant to Claims 1-9, 11-13, and 16.  To simplify review, the undersigned will first review the standards applicable to each type of dismissal sought, then review each claim asserted against Secor seriatim to determine whether that claim should be dismissed for any reason, whether a more definite statement is called for, or whether no action is required.

### B.    Applicable Standards

### 1.    Rule 9(b) Standard

When pleading fraud, the notice pleading requirements are inapplicable and special rules of pleading come into play.  Rule 9(b), Federal Rules of Civil Procedure,

provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition[s] of mind of a person may be averred generally.

The specificity required in claiming fraud is an exception to the provisions of notice pleading found in Rules 8(a),(e), and (f), Federal Rules of Civil Procedure. See also N.C. Gen. Stat. Chapter 1A-1, Rule 8. The general rule that pleadings are to be given liberal construction does not apply to claims of fraud. Rosenthal v. Perkins, 42 N.C. App. 449 (1979).

Because review is limited to the face of the pleadings and accompanying attachments, factual support outside of the record may not be considered and is treated as if it does not exist. A plaintiff must be particular as to the facts upon which its claim of fraud arises. Hoyle v. Bagby, 253 N.C. 778 (1961). An allegation which merely states that the acts specified constituted fraud is conclusory. Patuxent Development Co. v. Bearden, 227 N.C. 124 (1947). Conclusory allegations of fraud are insufficient to meet the requirement of particularity. Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518 (1985). The issue becomes whether proof of the facts as alleged in the Amended Complaint would entitle the plaintiffs to relief. Brooks Equipment & Mfg. Co. v. Taylor, 230 N.C. 680 (1949). Reliance on discovery to

support a claim of fraud is inappropriate. "A plaintiff must know about what he is complaining before he files [a] suit [claiming fraud]." <u>McFarland v. Memorex Corp.</u>, 493 F. Supp. 631, 656 (N.D. Cal. 1980). The district court's opinion in <u>McFarland</u> dovetails with the requirement of Rule 9(b) that "the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b), Fed. R. Civ. P. To allow otherwise would be to encourage actions for fraud based on "information and belief" rather than hard facts and firsthand knowledge.

### 2. Rule 12(b)(1)

Rule 12(b)(1) provides for dismissal where the court lacks jurisdiction over the subject matter of the lawsuit. Lack of subject-matter jurisdiction may be raised at any time either by a litigant or the court. <u>Mansfield, C. & L.M.R. Co. v. Swan</u>, 111 U.S. 379, 382 (1884). The ability of the court to independently address subject-matter jurisdiction is important to finality inasmuch as a litigant, even one who remains silent on the issue of jurisdiction, may wait until they receive an adverse judgment from a district court and raise the issue of subject-matter jurisdiction for the first time on appeal, thereby voiding the judgment. <u>Capron v. Van Noorden</u>, 2 Cranch 126, 127, 2 L.Ed. 229 (1804). The Federal Rules of Civil Procedure anticipate this issue and provide that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss

the action." Fed.R.Civ.P. 12(h)(3).

When a court considers its subject-matter jurisdiction, the burden of proof is on the plaintiff. <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982). In <u>Richmond, Fredricksburg & Potomac R.R. Co. V. United States</u>, 945 F.2d 765 (4th Cir. 1991) (Ervin, C.J.), the Court of Appeals for the Fourth Circuit held, as follows

> In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. <u>Id.</u>; <u>Trentacosta v. Frontier Pacific Aircraft Indus.</u>, 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. <u>Trentacosta</u>, <u>supra</u>, 813 F.2d at 1559 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. <u>Trentacosta</u>, <u>supra</u>, 813 F.2d at 1558. A district court order dismissing a case on the grounds that the undisputed facts establish a lack of subject matter jurisdiction is a legal determination subject to de novo appellate review. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 872 (4th Cir.1989); <u>Shultz v. Dept. of the Army</u>, 886 F.2d 1157, 1159 (9th Cir.1989).

<u>Id.</u>, at 768-69. Where jurisdictional facts are intertwined with facts central to the substance of a case, a court must find that jurisdiction exists and consider and resolve the jurisdictional objection as a direct attack on the merits of the case. <u>United States v. North Carolina</u>, 180 F.3d 574, 580 (4th Cir. 1999).

### 3. Rule 12(b)(6)

Where a defendant contends that a plaintiff has failed to state a cognizable claim, Rule 12(b)(6) authorizes dismissal based on a dispositive issue of law. <u>Neitzke v. Williams</u>, 490 U.S. 319, 109 S.Ct. 1827, 1832 (1989); <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); <u>Conley v. Gibson</u>, 355 U.S. 41 (1957). As the Court discussed in <u>Neitzke</u>:

> This procedure [for dismissal], operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and fact finding. Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law "it is clear that no relief could be granted under any set of facts . . . a claim must be dismissed, without regard to whether it is based on outlandish legal theory . . . . What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations."

<u>Id.</u>, at 1832 (citation omitted). Dismissal of a complaint is proper under Rule 12(b)(6) where it is clear that no set of facts consistent with the allegations in the plaintiffs' complaint could support the asserted claim for relief. <u>Taubman Realty Group LLP v. Mineta</u>, 320 F. 3d 475, 479 (4th Cir. 2003); <u>Migdal v. Rowe Price-Fleming Intl Inc.</u>, 248 F. 3d 321, 325-36 (4th Cir. 2001). However, the Court recently held that the "no set of facts" standard first espoused in <u>Conley</u>, <u>supra</u>, only describes the "breadth of opportunity to prove what an adequate complaint claims, not the minimum adequate pleading to govern a complaint's survival." <u>Bell Atlantic Corp. v. Twombly</u>, 550

U.S. 544 (2007).  Under <u>Twombley</u>, to survive Rule 12(b)(6) scrutiny, the claims

must at a minimum be "plausible."  <u>Id.</u>  Such decision has been further clarified:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S.Ct. 1937, 1950 (2009).

While the court accepts <u>plausible</u> factual allegations in the complaint as true

and considers those facts in the light most favorable to a plaintiff in ruling on a

motion to dismiss, a court "need not accept as true unwarranted inferences,

unreasonable conclusions, or arguments." <u>Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s,</u>

<u>LLP</u>, 213 F. 3d 175, 180 (4th Cir. 2000).

> The presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion. And although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant. This requirement serves to prevent costly discovery on claims with no underlying factual or legal basis.

<u>Migdal</u>, at 326 (citations and internal quotations omitted).  In addition, a court cannot

"accept as true allegations that contradict matters properly subject to judicial notice

or by exhibit." <u>Venev v. Wyche</u>, 293 F. 3d 726, 730 (4th Cir. 2002) (citations and

internal quotations omitted). For the limited purpose of ruling on defendants' motions, the court has accepted as true the facts alleged by plaintiff in the complaint and will view them in a light most favorable to plaintiff.

### 4.    Rule 12(e) Standard

In determining whether a more definite statement is mandated in a particular case, the court's inquiry begins with the language of the Rule:

> **(e) Motion For a More Definite Statement.**
> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 10 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

Fed.R.Civ.P. 12(e).  While stated in the context of notice pleading under Rule 8, the Court of Appeals for the Fourth Circuit has been quite clear on the limits of Rule 12(e):

> We do not hold that requiring a limited expansion of a complaint is never appropriate under Rule 12(e), for that is a matter generally left to the district court's discretion. But when the complaint conforms to Rule 8(a) and it is neither so vague nor so ambiguous that the defendant cannot reasonably be required to answer, the district court should deny a motion for a more definite statement and require the defendant to bring the case to issue by filing a response within the time provided by the rules. Prompt resort to discovery provides adequate means for ascertaining the facts without delay in maturing the case for trial.

Hodgson v. Virginia Baptist Hospital, Inc., 482 F.2d 821, 824 (4th Cir.1973). In the context of Rule 9(b), however, Rule 12(e) is used as a vehicle "to challenge a pleading based on insufficient particularization of the circumstances of an alleged fraud" under Rule 9(b). 5A Wright and Miller, *Federal Practice & Procedure* § 1300 (3d ed.2004).

This interplay between Rules 9(b) and 12(e) in the context of allegations of fraud under state law[12] was well discussed by the district court in RMA Lumber, Inc. v. Pioneer Machinery, LLC, 2008 WL 4693564 (W.D.Va. 2008):

> Where fraud is alleged, "the circumstances constituting fraud or mistake shall be pled with particularity." Fed.R.Civ.P. 9(b). In particular, the complaint must "specifically allege the time, place and nature of the fraud." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 980 (4th Cir.1990). Under Virginia law, " '[w]here fraud is relied on, the [pleading] must show specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defence [sic] accordingly, and since [fraud] must be clearly proved it must be distinctly stated.' " *Mortarino*, 251 Va. at 295 (citations omitted).
>
> The only specificity lacking in Plaintiff's Complaint is the proper name of the person who allegedly made the misrepresentations, and this is not a critical defect in this case, because Defendants were provided with sufficient notice as to who among their employees and agents may have made the statements, and enough information to understand the claim and frame a defense. Under Virginia law, the Complaint is not lacking in specificity as to "what the fraud consists," and Defendants were provided enough specifics to "have the opportunity of shaping"

---

[12] While the court therein was presented with a claim of fraud under the law of the Commonwealth of Virginia, there is no distinction relevant for these purposes between Virginia and North Carolina common law fraud.

their defense. *Id.* Plaintiff has pled with particularity the time, place, and contents of the representations; the failure to specifically identify in the Complaint the name of the person who made the alleged misrepresentations is not fatal.

\* \* \*

Moreover, at this early stage in a case, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999). Thus, for the same reasons that dismissal is not appropriate under Virginia law, dismissal under Rule 9(b) for failure to plead fraud with specificity is inappropriate here. In fact, the appropriate step would have been for Defendants to move for a more definite statement under Rule 12(e); however, it is clear enough why Defendants did not seek a more definite statement, given that arguments at the hearing on October 10, 2008, revealed that the name of Pioneer's employee who made the alleged misrepresentations has been disclosed by Plaintiff in discovery pursuant to Rule 26(a).

Id., at 6 -7(footnote omitted).

North Carolina and Virginia are not dissimilar in their jurisprudence of fraud.

The essential elements of a claim of fraud by misrepresentation in North Carolina are:

(1) a false representation or concealment of a material fact, (2) that was reasonably

calculated to deceive, (3) which was made with the intent to deceive, (4) that did in

fact deceive, and (5) resulted in damage. Jolly v. Acad. Collection Serv., 400

F.Supp.2d 851 (M.D.N.C. 2005).

To satisfy the specificity requirements of Rule 9(b) in pleading fraud by

misrepresentation under the common law of North Carolina, it is plaintiffs' obligation to plead the time, place, and contents of the false representations, as well as the identity of the person making the representation and what such person obtained thereby.

North Carolina also appears to recognize common law fraud through omission, which. Paragraphs 159 though 162 of the First Amended Complaint, and/or other paragraphs of the Amended Complaint, may well be read to raise fraud by omission as to Secor; therefore, the common law elements of such tort will be briefly discussed. In order to plead fraud by omission, a plaintiff must allege the following:

> (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

Breeden v. Richmond Community College, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (citations omitted).

### C.  Discussion

#### 1.  Secor's General Request Seeking Dismissal of All Claims

All of Secor's motions and requests are premised upon what Secor argues is a

lack of specific allegations against it in the First Amended Complaint. Specifically, Secor argues as follows:

> the First Amended Complaint ("Complaint") only alleges that some unidentified person, presumably connected with Southgroup, offered five generalized statements regarding a real estate development – such as, "This is going to be an amazing project" and "What I found is going to be a gold min[e] depending on where you are at" – to an unspecified recipient. Compl. ¶ 160. That is, literally, the only specific claim about Southgroup.

Secor's Brief, Docket Entry # 82, at 1. Such argument, however, does not accurately reflect the allegations actually made by plaintiffs in the First Amended Complaint, inasmuch as Secor has left out the portions of the attributed statements that are most germane. As discussed more thoroughly above, Secor and this court must consider the allegations of the First Amended Complaint in a light most favorable to plaintiffs, a duty which does not contemplate a selective reading of the allegations.

A fair reading of the First Amended Complaint reveals that plaintiffs have alleged that Secor engaged in direct marketing to potential investors through "Dear Investor" letters. Id., at ¶ 159. Plaintiffs further contend that Secor marketed the lot sales as "investments" and made misrepresentations in such correspondence and promotional materials, including misrepresentations concerning:

(1) the project being a "fully permitted project that covers over 1600 acres" when it was not;

-29-

(2)    that investors could receive an "estimated 2.5-3 million dollar return within five years";  and

(3)    that "Bank of America is involved with over $50 million invested" when they had invested nothing.  Id.

While Secor quotes only "What I found is going to be a gold min[e] depending on where you are at," Secor's Brief, at 1,  plaintiffs actually alleged that Secor stated:

> [w]hat I found is going to be a gold mind [*sic*] and depending on where you are at **with your debt to income there are guaranteed returns of 2.5 million for qualifying for a 500k loan with no money out of pocket.**

Id., at ¶ 160 (emphasis added as to the portion omitted from Secor's brief).  Such omitted portion of the statement is most relevant to the claims asserted against Secor by plaintiffs in their First Amended Complaint.  Indeed, a reasonable inference that could be raised from such omitted portion was that Secor purportedly made a material misrepresentation in an attempt to induce these plaintiffs to participate in the investment scheme.  Plaintiffs contend that such actions by Secor were intended to and did cause plaintiffs to participate in the scheme.  Id., at ¶ 161.  Finally, plaintiffs contend that Secor, as agents for certain (but unnamed) plaintiffs, owe them a "duty of good faith, full disclosure, and reasonable care, skill and diligence."  Id., at ¶ 162.

While the court  lacks any substantive brief from plaintiffs, the court will

address the Motion to Dismiss inasmuch as this case has stagnated and needs to be moved forward.[13]  Plaintiffs were afforded an opportunity to be heard, and were heard, at the hearing on the Motion to Dismiss.  The undersigned finds that plaintiffs' ability to be heard can be adequately preserved through the objection process.

In the first seven pages of Secor's brief, Secor argues in the form of asking the court questions and as such are not proper arguments.  The questions raised in the first seven pages of Secor's brief may find answers in the discovery process.  To the extent that within the first seven pages Secor asks this court to generally dismiss the complaint as a whole, the undersigned must recommend that such motion be denied.  Beginning at page eight of Secor's brief, arguments are made in support of each particular motion, which will now be addressed.

## 2.    Subject Matter Jurisdiction

In their Rule 12(b)(1) motion, Secor contends that subject matter jurisdiction is lacking because plaintiffs lack standing to sue. Secor's Brief, at 8.  Secor first argues that plaintiffs have failed to allege a causal connection between plaintiffs and Secor.  Id.  More in line with the case law, it is not a causal connection between the parties, but a causal connection between the harm allegedly suffered by plaintiffs and

---

[13]      Plaintiffs were afforded an opportunity to file a substantive brief on the Motion to Dismiss, but apparently decided not to file such brief but to instead rely on their motion to either strike the affidavit or have the motion converted to one for summary judgment.

the alleged actions of the defendant.

A fair reading of the First Amended Complaint reveals that plaintiffs have alleged a causal connection between the harm they suffered (loss of their investment) and Secor's conduct, which include alleged material misrepresentations made to them by Secor, including that "there are guaranteed returns of 2.5 million for qualifying for a 500k loan with no money out of pocket."[14] Id., at ¶ 160. Plaintiffs contend that such representation, among others, by Secor were intended to and did cause plaintiffs to participate in the scheme. Id., at ¶ 161. They further contend that Secor, as agents for certain (but unnamed) plaintiffs, owe them a "duty of good faith, full disclosure, and reasonable care, skill and diligence." Id., at ¶ 162. Plaintiffs have, therefore, alleged a causal connection between the harm they allegedly suffered and the actions of Secor. The undersigned must, therefore, recommend that the Rule 12(b)(1) motion be dismissed as plaintiffs have standing to sue Secor.

### 3.      Failure to State a Claim

While dismissal based on failure to state a claim will be addressed by the court as to each claim asserted, Secor has made a universal argument that due to the lack of specificity in naming the actual plaintiffs purportedly harmed by Secor or who had

---

[14]      The court respectfully  does not agree with plaintiffs' characterization of this and other statements as "general puffery."  Plaintiffs' Brief, at 9-10.

contact with Secor, plaintiffs have failed to state any viable cause of action. Secor argues:

> nearly all of the claims require specific information that, as to Southgroup [Secor], Plaintiffs have not provided. For the claims that sound in fraud, for example, there is no particularity as to Southgroup. For the breach of contract claim, there is – incredibly – no allegation that Southgroup was a party to a contract with any or all of the Plaintiffs or even with any other Defendants. Similarly, for the negligence and breach of fiduciary duty claims, Plaintiffs allege no facts to show what relationship existed between any particular Plaintiff (let alone all of the Plaintiffs) and Southgroup that creates any duty or obligation.

Secor's Brief, at 12-13. The undersigned agrees with the central theme of the argument that plaintiffs' shotgun approach to pleading leaves much to be desired inasmuch as Secor has a right to know which plaintiffs contend they were harmed by Secor. It is clear, however, that the claims that do not involve allegations of fraud have no particularity requirement.  As will be discussed below, plaintiffs will need to shore up their fraud claims under Rule 12(e).

The general sufficiency of the pleading issue has, however, raised a more general concern for the undersigned, and that is the efficacy of a "mass action" that involves not just multiple plaintiffs, but multiple alleged tortfeasors, against whom not all plaintiffs have a cause of action.  The commonality which a mass action attempts to address is quickly undermined where plaintiffs have different causes of action against different defendants. Under 28, United States Code, Section

1332(d)(2):

> [t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—
> (A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
> (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
> (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

28 U.S.C. § 1332(d)(2). Under the *Class Action Fairness Act of 2005* (hereinafter "CAFA"), Pub.L. No. 109-2, 119 Stat. 4, Congress defined a "mass action" as

> any civil action ... in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact.

Id., at 1332(d)(11)(B)(i). In another mass action involving sales of residential units, the district court for the Southern District of Florida used a four-factor test to determine whether plaintiffs' claims were properly before the federal court under CAFA:

> . . . CAFA provides for removal of only certain types of class actions. 28 U.S.C. § 1332(d)(2). Reading both of these subsections together, the Eleventh Circuit has determined that the following requirements must be met in order for a case to be removable as a "mass action" under CAFA: "(1) an amount in controversy requirement of an aggregate of $5,000,000 in claims; (2) a diversity requirement of minimal diversity; (3) a numerosity requirement that the action involve the monetary claims of 100 or more plaintiffs; and (4) a commonality requirement that the

-34-

plaintiffs' claims involve common questions of law or fact." Lowery v. Ala. Power Co., 483 F.3d 1184, 1202-03 (11th Cir.2007).

Galstaldi v. Sunvest Communities USA, LLC, ___ F.R.D. ___, 2009 WL 415258, 2

(S.D.Fla. 2009).[15]  The first three factors are clearly met in this case as they were in

Galstaldi, however, the district court's resolution of the fourth factor, commonality,

is instructive here:

> the Complaint states that "[e]ach Plaintiff's claim is essentially identical to the claims of each other Plaintiff" ( id. at ¶ 246), and "all Plaintiffs have a common right of recovery based on the same essential facts" ( id.), thus appearing to satisfy the commonality requirement.

Id.[16]  In this case, review of the First Amended Complaint would not lead one to

conclude that each plaintiff's claim is "essentially identical" to the claims of each

other plaintiff, as the captions to the claims make clear.  While plaintiffs have

asserted that each of their claims are asserted by "all plaintiffs," it appears that there

is a mix of defendants in each claim, and that a pair of plaintiffs assert certain claims

only against a certain defendant.[17]  Further, while the claims may be asserted by "all

---

[15]    Due to the limits of Electronic Case Filing, a copy of unpublished decisions cited herein is placed in the electronic docket through incorporation of the Westlaw citation.

[16]    While the four-factor test is a creation of the Court of Appeals for the Eleventh Circuit, it does not appear from the undersigned's research that the Fourth Circuit has developed a mass-action test.  In any event, the undersigned finds such Eleventh Circuit test persuasive.

[17]    These "certain claims" against "a certain defendant" may have been amicably resolved.

plaintiffs," it is questionable as to whether they are actually asserted against each defendant in each claim. This issue is not, in the context of commonality in a mass action, now before the court, but it does cause the undersigned some concern as to whether this is truly a mass action. Certainly, the method of pleading in this action has caused the court to spend days reviewing what should have been a routine and straight forward motion to dismiss. With such reservations, the undersigned can find no reason to universally dismiss the claims against Secor for failure to state a cause of action.

### 4.    Motions to Dismiss Claims One through Six

Secor first contends that Claims One through Three should be dismissed because the sale of lots was not the sale of a security under North Carolina law. While agreeing that the sale and purchase of a residential lot is not a "security" under North Carolina law in the typical scenario, the undersigned respectfully disagrees with Secor's theory that it never can be a "security." While the North Carolina legislature probably never envisioned a developer selling residential lots in a subdivision for any other purpose than for families to build homes, mankind tends to "believe no evil till the evil's done."[18]

On a motion to dismiss, the undersigned has looked to the allegations of the

---

[18]    Jean de La Fontaine, *Fables, bk. I, fable 8 (1668).*

First Amended Complaint and finds that plaintiffs have made sufficient allegations

from which it could be determined that the sale of lots in VOP amounted to the sale

of a security under North Carolina law. In defining a security or an "investment

contract," North Carolina law provides as follows:

> (11) "Security" means any note; stock; treasury stock; bond; debenture;
> evidence of indebtedness; certificate of interest or participation in any
> profit-sharing agreement; collateral-trust certificate; preorganization
> certificate or subscription; transferable share; investment contract
> including without limitation any investment contract taking the form of
> a whiskey warehouse receipt or other investment of money in whiskey
> or malt beverages; voting-trust certificate; certificate of deposit for a
> security; certificate of interest or participation in an oil, gas, or mining
> title or lease or in payments out of production under a title or lease;
> viatical settlement contract or any fractional or pooled interest in a
> viatical settlement contract; or, in general, any interest or instrument
> commonly known as a "security," or any certificate of interest or
> participation in, temporary or interim certificate for, receipt for
> guarantee of, or warrant or right to subscribe to or purchase, any of the
> foregoing. "Security" does not include any insurance or endowment
> policy, funding agreement, as defined in G.S. 58-7-16, or annuity
> contract under which an insurance company promises to pay (i) a fixed
> sum of money either in a lump sum or periodically for life or for some
> other specified period, or (ii) benefits or payments or value that vary so
> as to reflect investment results of any segregated portfolio of
> investments or of a designated separate account or accounts in which
> amounts received or retained in connection with a contract have been
> placed if the delivering or issuing insurance company has currently
> satisfied the Commissioner of Insurance that it is in compliance with
> G.S. 58-7-95.

N.C.Gen.Stat. 78A-2(11). Commentators provide further guidance on what

constitutes a security:

Under the *Howey* test, an "investment contract" subject to a security registration requirement is a contract, transaction, or scheme whereby a person (1) invests money (2) in a common enterprise (3) with profits to come solely from the efforts of others. For purposes of a security registration requirement, a "common enterprise" is one in which the fortunes of the investor are interwoven with, and dependent upon, the efforts and success of those seeking the investment or that of third parties.

In determining whether the "common enterprise" element is satisfied, according to some authority, the commonality must be horizontal, that is among investors. According to other authority, however, vertical commonality, or a common enterprise between an investor and a promoter, is acceptable. Thus, proof of horizontal commonality, that is, the pooling of interests, not only between the seller and each individual buyer, but also among all those who buy an investment contract in the same venture, is not required to have a solicitation to loan money involve a security, within the statutory meaning of the term "security."

> **Observation**: "Vertical commonality," for purposes of an investment contract subject to a security registration requirement, exists where the investor's fortunes are interwoven with, and dependent upon, the success of the promoter.

Where a loan is given and repayment is secured by specified accounts receivable, such a loan does not involve horizontal commonality and is not a security in a jurisdiction requiring horizontal commonality, although it is a security in a jurisdiction accepting vertical commonality. Similarly, where funds are provided by one party to finance a business to be run by others, or where a corporation issues a secured note plus an option to convert the note into shares of stock, or where an investor is guaranteed a return of the invested funds plus a share of the profits of an enterprise, an investment contract exists in jurisdictions accepting vertical commonality under the *Howey* test.

AMJUR SECREGS § 25,69A Am. Jur. 2d Securities Regulation—State § 25

(footnotes omitted).

Plaintiffs have alleged both horizontal and vertical commonality in the First Amended Complaint, which is clearly sufficient to allege facts upon which a security or investment contact could be found. From the definition alone, it is apparent that plaintiffs have alleged that defendants were engaged in vending "participation in [a] profit-sharing agreement." N.C.Gen.Stat. 78A-2(11). Further, North Carolina requires its courts to look not only to the language of the contract or the papers evidencing the agreement, but to consider the economic reality of the situation to determine whether the investor has any real control over management of his or her investment. Waterman v. Alta Verde Industries, Inc., 643 F.Supp. 797 ( E.D.N.C. 1986), aff'd, 833 F.2d 1006 (4th Cir. 1987). In this case, plaintiffs have specifically alleged that the investment scheme was structured in such a manner that they lost complete control over their investment because defendants had structured the scheme in such a manner that they could not resell their lots. First Amended Complaint, at ¶ 130. To the extent Secor seeks dismissal for failure to allege a security recognized under North Carolina law, the undersigned must recommend that this Motion to Dismiss be denied.

Secor further contends that Count One should be dismissed because plaintiffs have failed to allege how Chapter 78A-24 of the North Carolina General Statutes permits a private cause of action against it. Section 78A-56(a)(2) provides for civil

liability for any person who

> [o]ffers or sells a security by means of any untrue statement of a material
> fact or any omission to state a material fact necessary in order to make
> the statements made, in the light of the circumstances under which they
> were made, not misleading (the purchaser not knowing of the untruth or
> omission), and who does not sustain the burden of proof that he did not
> know, and in the exercise of reasonable care could not have known, of
> the untruth or omission ...

N.C.Gen.Stat. § 78A-56(a)(2). Secor argues that another district court has held that

Section 78A-56 provides a cause of action "only against an offeror or seller." Secor's

Brief, at 13-14, citing  Venturtech II v. Deloitte Haskins & Sells, 790 F.Supp. 576,

588 (E.D.N.C. 1992).  While Secor accurately quotes the district court, Secor has left

out the modifier "express cause of action" which preceded the quoted portion of the

district court's statement in Venturtech II.  More completely, the district court stated

> Section 78A-56(a)(2) creates an express cause of action only
> against an offeror or seller. Whether an implied cause of action exists
> under this section against aiders and abettors or other substantial
> participants is hotly contested by the parties. The plaintiffs argue that,
> pursuant to this court's earlier interpretation of § 12(2) of the *Securities
> Act of 1933* ("the 1933 Act") upholding aider and abettor liability, the
> court should follow the same reasoning here. To the contrary, the
> defendant contends that aider and abettor liability is not appropriate
> under either § 12(2) of the 1933 Act or § 78A-56.
>     Because § 78A-56 parallels § 12(2) of the 1933 Act, cases
> construing § 12(2) should be considered when interpreting § 78A-56.
> *See State v. Williams*, 98 N.C.App. 274, 390 S.E.2d 746 (1990). Both
> the United States Supreme Court and the Court of Appeals for the
> Fourth Circuit have refrained expressly from deciding whether § 12(2)
> liability extends to non-statutory sellers as aiders and abettors. *See*

> *Pinter v. Dahl*, 486 U.S. 622, 642 n. 20, 108 S.Ct. 2063, 2076 n. 20, 100 L.Ed.2d 658 (1988); *Schatz v. Rosenberg*, 943 F.2d 485, 496 n. 5 (4th Cir.1991), *cert. denied*, *Schatz v. Weinberg & Green*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir.1989). <u>As the plaintiffs point out, this court in past decisions has extended § 12(2) liability to aiders and abettors</u>. *See, e.g., In re Conner Bonds Litig.*, [1988-1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,969 at 90,525 (E.D.N.C. July 21, 1988). <u>Without revisiting the question of aider and abettor liability under § 12(2), the court finds that, assuming aider and abettor liability under *589 § 78A-56, the plaintiffs cannot support such a cause of action.</u>

<u>Id.</u>, at 588-589 (emphasis added). While the district court in <u>Venturtech II</u> clearly did not extend aider and abettor liability in the context of Chapter 78A-56, it cannot be said that they ruled out such theory of liability. Indeed, a fair reading of the case would lead one to believe that had the district court reached the issue, it is likely that it would have found that aiders and abettors could be liable under North Carolina law just as the same court found such to exist under Section 12(2) of the *Securities Act of 1933*. Such reading of <u>Venturtech II</u> is buttressed by the district court's recognition that North Carolina law *requires* courts to look to federal case law construing Section 12(2) when interpreting the state's Section 78A-56. <u>State v. Williams</u>, 98 N.C.App. 274, 390 S.E.2d 746 (1990). The district court went on to define the elements of aider and abettor liability:

> A cause of action for aiding and abetting a securities violation is comprised of three elements. The plaintiff must prove "(1) a primary

-41-

violation by another person; (2) the aider and abettor's 'knowledge' of the primary violation; and (3) substantial assistance by the aider and abettor in the achievement or consummation of the primary violation." *Schatz*, 943 F.2d at 495. Addressing the second element, the Fourth Circuit held that, absent a duty owed to the plaintiff by the alleged aider and abettor, the defendant aider and abettor must possess "a 'high conscious intent' and a 'conscious and specific motivation' to aid the fraud." *Id.* at 496 (*citing ITT, an Int'l Invest. Trust v. Cornfeld*, 619 F.2d 909, 925 (2d Cir.1980)). This court has already determined that the defendant did not owe a duty to the plaintiffs. Therefore, the plaintiffs are required to prove that DH & S entertained a "high conscious intent" and "specific motivation" to aid the alleged securities violation committed by LRI.

Venturtech II , at 589.

In the context of a motion to dismiss, plaintiffs must make sufficient allegations as to each element. Clearly, plaintiffs have satisfied the pleading requirements of the first and third elements because the First Amended Complaint is replete with allegations of a primary violation by the developer defendants and allegations that Secor and others provided substantial assistance to the Developer Defendants in carrying out the scheme.

The crucial element, however, is knowledge: in the context of a motion to dismiss, the question is whether plaintiffs have alleged that the assistance given to the Developer Defendants in their commission of securities fraud was *knowing*. The undersigned has closely reviewed paragraphs 159-162 of the First Amended Complaint, which deal with Secor, and can find no mention that Secor knew that the

Developer Defendants were engaged in securities fraud. This lack of specificity is in stark contrast to the allegations made against the Lender Defendants, which is captioned "The Lender Defendants' Knowledge of, Involvement in and Ratification of the Investment Scheme." First Amended Complaint, at ¶ 165.

Lacking an explicit allegation that Secor knew the Developer Defendants were engaged in fraudulent conduct, the undersigned has read the First Amended Complaint to determine whether any such allegation could be implied. Reading the pleadings in a light most favorable to plaintiffs, they have alleged that Secor made a number of statements concerning a "guaranteed" return on investment. A reasonable inference may arise from those allegations that Secor had constructive knowledge inasmuch as the claims were so extravagant as to place any reasonable person on notice that fraud was afoot.

The question then becomes whether an allegation of constructive knowledge is sufficient to allege securities fraud. While fraud or mistake must be pleaded with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). While the making of reckless statements in furtherance of a scheme may be proof of constructive knowledge, it would appear that *actual* knowledge must be alleged and then later proved. In a decision addressing a claim for aiding and abetting a violation of federal securities

law, the Court of Appeals for the Eighth Circuit held, as follows:

> a defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability. Such knowledge may be proved by and inferred from circumstantial evidence, including facts available to the defendant's employees."**Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme**."

K & S Partnership v. Continental Bank, N.A., 952 F.2d 971, 977 (8th Cir. 1991)(citations omitted)(emphasis added).  At this point, the only issue is whether plaintiffs have properly pleaded knowledge, and it appears that they have albeit by the narrowest of margins.  Thus, at summary judgment or trial, plaintiffs will not be able to rely on its allegations, but will be required to produce evidence of actual awareness of involvement in a fraudulent scheme.  This is precisely what discovery is intended to flush out, and if it cannot be found, it would be incumbent on plaintiffs to take a dismissal of any unsupportable claim.  Thus, the Motion to Dismiss as to Claim One should be denied.

While application of decisions interpreting federal securities laws to North Carolina securities laws saves plaintiffs' aiding an abetting theory under North Carolina securities law, federal law decisions also inform the court on the proper method for pleading securities fraud.  The first principle is that a corporation simply cannot act except through its employees or agents:

Under ordinary principles of the law of agency, a corporation is deemed to have the requisite *scienter* for fraud only if the individual corporate officer making the misstatement has the requisite level of scienter.

Venturtech II, supra.  Where a claim for violation of the federal securities act is made, plaintiffs

must also satisfy the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA [Private Securities Litigation Reform Act] to avoid dismissal. Rule 9(b) requires certain minimum allegations to be pled in securities fraud cases including the specific place, time and content of the false representations as well as the identity of the individual making the false representations and what that person gained from making the representations.

Berger v. Beletic, 248 F.Supp.2d 597, 601 (N.D.Tex. 2003).  In another securities fraud action, another district court identified with precision the problem with pleading securities fraud without precision:

Not only does the complaint's lack of specificity preclude analysis of discrete units subject to individual evaluation, but the complaint also comes very close to alleging "fraud by hindsight," a liability theory long disfavored in this circuit.

Zouras v. Hallman, 2004 WL 2191034, 7 (D.N.H. 2004)(citations omitted).  Put another way, if it is worth pursuing a claim against Secor, then it is worth setting out in such claim the specific allegations which inform plaintiffs' belief that Secor aided and abetted securities fraud.  While plaintiffs have alleged the representations made, they have failed to attribute such representations to any employee or officer, and there

are absolutely no allegations of who said what to whom, the time, or the place of the alleged misrepresentations. Similar Rule 9(b) problems are found in all of the securities violations alleged against Secor (Claims One, Two, and Three), the claim for common law fraud (Claim Four), the claim for fraud in the inducement (Claim Five), and constructive fraud (Claim Six).

In considering these deficiencies, the undersigned has reviewed the applicable standards set forth above. As discussed earlier, the proper method for curing a Rule 9(b) deficiency is not in dismissing the claim; rather, the correct method is in requiring a more definite statement of the claim under Rule 12(e). The undersigned will, therefore, recommend that the Motion to Dismiss as to Claims 1-6 be denied, but that plaintiff be directed to serve and file a more definite statement as to each of these claims addressing the concerns herein raised.

### 5. Motion to Dismiss Claim Seven

Secor next argues that the breach of fiduciary duty claim (Claim Seven) should be dismissed. In this argument, Secor again argues the lack of specificity, but also heavily relies on plaintiffs failure to allege the nature of the fiduciary duty supposedly owed by Secor to plaintiffs. A fiduciary relationship must exist between the parties before a claim can arise for breach of that fiduciary duty. White v. Consol. Planning, Inc., 166 N.C.App. 283, 293 (2004), disc. review denied, 359 N .C. 286 (2005). It

is well settled that a fiduciary relationship arises only when plaintiffs place special confidence in another person, to the extent that the party in whom such special confidence is placed is bound to act in the best interests of the party placing the confidence. Dalton v. Camp, 353 N.C. 647, 651 (2001). An essential element of the fiduciary relationship is that the purported fiduciary exercised influence over the plaintiffs by virtue of the trust placed in such alleged fiduciary. Id., at 652.

No fiduciary relationship *at law* exists between the developer and purchaser of property. Morris v. Hennon & Brown Properties, LLC, 2008 WL 2704292, at 5 (M.D.N.C. 2008). A fiduciary relationship has, however, been found to exist between a seller of securities and a buyer of securities. First Union Discount Brokerage Services, Inc. v. Milos, 744 F. Supp. 1145 (S.D. Fla. 1990), aff'd, 997 F.2d 835 (11th Cir. 1993); Saboundjian v. Bank Audi (USA), 157 A.D.2d (1st Dep't 1990); Byrley v. Nationwide Life Ins. Co., 94 Ohio App. 3d 1, 640 N.E.2d 187 (6th Dist. Erie County 1994). The actual existence of a fiduciary duty between a securities broker and the client is a question of fact to be determined by the trier of fact. Schwartz v. Oberweis, 826 F. Supp. 280 (N.D. Ind. 1993).

In their First Amended Complaint, plaintiffs allege that defendants were bound to act in good faith with respect to the "Investment Contract in Question." First Amended Complaint, at ¶ 251(b). Generally, a contract cannot form the basis of a

fiduciary relationship. The Court of Appeals for the Fourth Circuit recognized in

South Atlantic Ltd. P'ship of Tenn. L.P. v. Riese, 284 F.3d 518, 533 (4th Cir. 2002),

that

> North Carolina is reluctant to impose 'extracontractual fiduciary
> obligations' in the context of general commercial contracts; thus, even
> when parties to an arms-length transaction have reposed confidence in
> each other, no fiduciary duty arises unless one party thoroughly
> dominates the other."

Id. Since plaintiffs allege a breach of fiduciary duty in the context of the sale of a

security in the form of an "Investment Contract," albeit an unlawful one, it would

appear that this general prohibition on fiduciary relationships springing from "general

commercial contracts" would be inapplicable.

Thus, plaintiffs have alleged a proper fiduciary relationship between a seller

and buyer of securities. It also appears that North Carolina courts have recognized

an aider and abettor theory for breach of fiduciary duty in the context of sales of

securities. Blow v. Shaughnessy, 88 N.C.App. 484 (1988). The undersigned will,

therefore, recommend that Secor's Motion to Dismiss Claim Seven be denied as a

claim has in fact been stated.

### 6. Motion to Dismiss Claim Eight

As to  negligent misrepresentation (Claim Eight), in alleging a claim for

negligent misrepresentation, plaintiffs must allege that they

(1)     justifiably relied to their detriment;

(2)     on information prepared without reasonable care;

(3)     by a person who owed the relying party a duty of care.

Hudson-Cole Dev. Corp. v. Beemer, 132 N.C.App. 341, 346 (1999).   The only

possible concern with the allegations contained in Claim Eight is plaintiffs' allegation

that the duty arose from defendants, including Secor, as fiduciaries.  First Amended

Complaint, at ¶ 256.  One need not, however, be a fiduciary or owe a fiduciary duty

in order for the duty of care to arise under common law:

> Recent cases shed light on the issue of a duty to supply accurate financial information. An approach was adopted in *Raritan River Steel Co.*, 322 N.C. at 209, 367 S.E.2d at 612 (discussing the liability of accountants when providing negligent information). This approach was recently applied in a potentially instructive case, Jordan v. Earthgrains Cos. Inc., 155 N.C.App. 762, 576 S.E.2d 336, 340 (2003). Breach of duty owed in negligent misrepresentation cases has been defined as:
>> "... One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
>
> *Jordan*, 155 N.C.App. at 767, 576 S.E.2d at 340 (*quoting Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 218, 513 S.E.2d 320, 323-24 (1999)).

Kindred of North Carolina, Inc. v. Bond,  160 N.C.App. 90, 100 (2003).  Thus, it

would appear that a fiduciary duty is not a predicate to bringing a cause of action for negligent misrepresentation. Instead, plaintiffs must only be able to the allege that the misrepresentation was made in the course of the defendant's business, profession or employment, or in any other transaction in which such defendant has a pecuniary interest. Clearly, the allegations of the First Amended Complaint easily support just such a contention. For those reasons, the undersigned will recommend that Secor's Motion to Dismiss Claim Eight be denied.

### 7.    Motion to Dismiss Claim Nine

As to plaintiffs' claim for conversion (Claim Nine), Secor contends that this claim should be dismissed as the First Amended Complaint does not "offer assertions" that Secor "holds 'dominion' over Plaintiffs' property." Secor's Brief, at 24. As will be discussed below, no allegation of dominion is required under North Carolina law.

The essential elements of a claim for conversion under North Carolina law include the following:

(1)    an unauthorized assumption and exercise of the right of ownership;

(2)    over goods or personal chattels belonging to another; and

(3)    to the alteration of their condition or the exclusion of an owner's rights.

Myers v. Catoe Constr. Co., 80 N.C.App. 692, 695 (1986). The lack of an allegation

of dominion over plaintiffs' property is not, however, a basis for dismissal:

> The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner ... and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act."

Lake Mary Ltd. P'ship. v. Johnston, 145 N.C.App. 525, 532, rev. denied, 354 N.C. 363 (2001) (quotation marks and citation omitted).  Thus, plaintiffs' claim for conversion is sufficient on its face.  The undersigned will respectfully recommend that Secor's Motion to Dismiss Claim Nine be denied.

### 8.    Motion to Dismiss Claim Eleven

Secor also argues that plaintiffs' UDTPA claim (Claim Eleven) is lacking because "it offers neither particulars" as to the alleged deceptive practice nor the connection between such act and injury.  Particulars are not, however, required inasmuch a UDTPA claim is not subjected to Rule 9(b) scrutiny.

> Unlike the claim of fraud, which brings into play Rule 9(b), there is no heightened pleading requirement for a UDPTA claim based on deception, making plaintiff's allegations sufficient at this stage of the litigation.

Smith v. Dade Behring Holdings, Inc., 2007 WL 152119, 18 (W.D.N.C. 2007)(Thornburg, J.) To state a cause of action under the UDTPA, plaintiffs must allege the following:

(1)    conduct constituting an "unfair or deceptive act or practice;"

(2)    conduct "in or affecting commerce," and

(3)    that such conduct proximately caused actual injury to plaintiff.

<u>Food Lion, Inc. v. Capital Cities/ABC Inc.</u>, 951 F. Supp. 1224, 1230 (M.D.N.C. 1996).[19] The Court of Appeals for the Fourth Circuit has noted that "[w]hat constitutes an unfair or deceptive trade practice is a somewhat nebulous concept," and that North Carolina courts review the particular circumstances of each case. <u>Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond</u>, 80 F.3d 895, 902 (4th Cir.1996). "Thus, whether a particular practice violates the [UDTPA] is both a question of law and a highly fact-specific inquiry." <u>South Atl. Ltd. P'ship of Tenn., LP v. Riese</u>, 284 F.3d 518, 535 (4th Cir.2002).  Absent some showing that a cause of action has not been pleaded, determining whether the totality of the circumstances warrant a UDTPA going to trial is best left to summary judgment where the fact-specific inquiry can be more properly made.  The undersigned must, therefore, recommend that Secor's Motion to Dismiss Claim 11 be denied.

### 9.    Motion to Dismiss Claim 12

---

[19]    While not herein raised, the court is concerned that plaintiffs are asserting a UDTPA claim in a case where defendants were supposedly engaged in issuing securities, albeit unlawful ones, and that under state law, the UDTPA cannot be used to regulate extraordinary events such as raising capital.  <u>HAJMM Co. v. House of Raeford Farms, Inc.</u>, 328 N.C. 578, 593 (1991).

As to Secor's Motion to Dismiss plaintiffs' cause of action under the North Carolina *Mortgage Lending Act* (Claim 12), the undersigned respectfully agrees that such statute does not provide plaintiffs with a private cause of action. Not only does the statute clearly contemplate assisting the banking Commission with regulation of mortgage brokers, <u>see</u> N.C.Gen.Stat. § 53-243.01, 12, the court cannot find a reported case in which it was held that such act provides a private cause of action. While it is clear that the statute makes it <u>unlawful</u> for any person to engage in mortgage lending who is not licensed by the state board, N.C.Gen.Stat. § 53-243.01, it is equally clear that the only enforcement authority is that of the banking commissioner to impose appropriate discipline, N.C.Gen.Stat. § 53-243.12, which would include enjoining non-licensees and imposing a civil penalty for violation of such injunctive relief. N.C.Gen.Stat. § 53-243.12(d). Violation of such act is also a criminal offense. N.C.Gen.Stat. § 53-243.14. If plaintiffs have case law that supports their assertion of a private right of action, they should present it in the form of an objection to the undersigned's recommendation that this claim be dismissed.

### 10.    Motion to Dismiss Claim 13

As to Claim 13, civil conspiracy, Secor contends that under North Carolina law if the tort of civil conspiracy exists, the law would require that a wrongful act in furtherance of the conspiracy be alleged and that it be further alleged that damage

occurred to the plaintiff as a result of the wrongful act.  The elements of tort for the wrongful acts committed in the course of a civil conspiracy in North Carolina would appear to be:

(1)     an agreement between two or more persons to commit a wrongful act;

(2)     an act in furtherance of the agreement; and

(3)     damage to the plaintiff as a result of the wrongful act.

See Henderson v. LeBauer, 101 N.C. App. 255, 260 (1991).

In the First Amended Complaint, plaintiff have alleged that "Defendants conceived of and implemented a common scheme to engage in the conduct complained of herein . . . ."  First Amended Complaint, at ¶ 277.  While such allegation would be insufficient standing alone, plaintiffs have incorporated into such claim the previous allegations of the First Amended Complaint. Id., at ¶ 273.  Thus, plaintiffs have pleaded more than a simple conspiracy, they have pleaded that the defendants "implemented" such scheme, and through incorporation of earlier pleaded allegations, committed  wrongful acts, which plaintiffs contend injured them.

As this district has recently recognized, this claim cannot be brought independent of properly-alleged claims for underlying wrongdoing, making such claim subject to dismissal if the underlying claims for wrongful conduct are dismissed. Precision Components, Inc. v. C.W. Bearing USA, Inc., 3:06-CV-259 (W.D.N.C. Dec.

16, 2008) (Reidinger, J.). Such point has yet to be reached.

Finally, the court has not considered Secor's argument that such claim should be dismissed because it "was not a participant in any underlying wrongdoing" as that is an issue of fact inappropriate for resolution on a Motion to Dismiss. Secor's Brief, at 28. The undersigned will, therefore, recommend that the Motion to Dismiss Claim 13 be denied.

### 11.     Motion to Dismiss Claim 16

As to plaintiffs' claim for negligence, Claim 16, Secor argues that this claim should be dismissed because plaintiffs have failed to connect any plaintiff to Secor, failed to allege the duty Secor owed to those plaintiffs or how that duty was breached, and what damages were actually caused by any breach of duty.

The essential elements of a cause of action for negligence are duty, breach of that duty, proximate cause, and damages. <u>Camalier v. Jeffries</u>, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995). In order to recover "all damages must flow directly and naturally from the wrong, and . . . they must be certain both in their nature and in respect to the cause from which they proceed." <u>People's Center, Inc. v. Anderson</u>, 32 N.C.App. 746, 748 (1977) (citation omitted). "[N]o recovery is allowed when resort to speculation or conjecture is necessary to determine whether the damage resulted from the unlawful act of which complaint is made or from some other source." <u>Id.</u>, at

748-49 (citation omitted).

In paragraphs 291 through 293 of the First Amended Complaint, plaintiffs clearly allege each element of the tort of negligence. Inasmuch as notice of the claim is all that is required in pleading negligence, <u>Sutton v. Duke</u>, 277 N.C. 94, 102 (1970), and it appearing that plaintiffs have met those minimal requirements, the questions raised in Secor's motion can all be answered through discovery.

> [T]he notice theory of pleading does not necessarily mean that there must be a full-blown trial. Utilizing the 'facility of pretrial discovery, the real facts can be ascertained and by motion for summary judgment (or other suitable device) the trial court can determine whether as a matter of law there is any right of recovery on those facts.'

<u>Id.</u>, at 104 (citation omitted). If unsatisfied with those answers, Secor can move for summary judgment "at any time." Fed.R.Civ.P. 56(b). The undersigned will, therefore, recommend that Secor's Motion to Dismiss Claim 16 be denied.

### D.    Motion to Sever

Secor seeks to sever the claims of any plaintiffs which may have claims against it from the claims of plaintiffs that only have claims against the co-defendants. Secor argues as follows:

> the Court should sever from an action against Southgroup any Plaintiffs who cannot allege that there was any contract, agency relationship, or other connection between themselves and Southgroup that could give rise to a legal action.

Secor's Brief, at 30. Secor provides argued in a footnote that such severance such be accomplished through Rule 21 misjoinder of parties. The court, while it has concerns as to the efficacy of this case proceeding as a mass action, *supra*, finds that a review of the entire First Amended Complaint would not support a finding that Secor or the claims against it have been misjoined in this action as all the claims share a common nucleus of operative facts, which is the alleged fraudulent investment scheme at Villages of Penland.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that:

(1) Motion to Stay Proceedings and to Compel Arbitration (#11) be **DENIED** as moot;

(2) Joint Motion to Dismiss Claims of Michael and Donna Stead Against Defendant Carolina First Bank (#76) be **DENIED** as moot;

(3) Plaintiffs' Motion to Convert Defendant Secor's Motion to Dismiss to Summary Judgment Motion and Permit Discovery Sufficient to Respond to Defendant's Motion (#89) be **DENIED** and that all materials submitted by Secor outside the record be **STRICKEN;** and

(4) Motion to Dismiss, Motion for More Definite Statement (#82) be **ALLOWED** in part and **DENIED** in part as follows:

(a) as to Claims One through Six, that the Motion to Dismiss be **DENIED**, and the Motion for a More Definite Statement be **ALLOWED,** and that plaintiffs be required to serve and file a more definite statement of their claims as discussed herein;

(b) as to Claims Seven, Eight, Nine, Eleven, Thirteen, and Sixteen, that the Motion to Dismiss be **DENIED**;

(c) as to Claims Twelve, that the Motion to Dismiss be **ALLOWED**; and

(d) that such motions be otherwise **DENIED**.

(5) the Motion to Sever (#82) be **DENIED**; and

(6) the undersigned will recommend that any parties who have settled their claims amicably be granted leave to amend the pleadings solely to delete claims made by such plaintiffs against such defendants and that no answers or other responses be either required or allowed.

The district court and the parties not present at the hearing are respectfully advised that due to the age of this case, the court Ordered discovery to commence at the hearing of these motions and will enter a Pretrial Order  simultaneously with this Memorandum and recommendation.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (**10**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208 (1984).

Signed: June 22, 2009

Dennis L. Howell
United States Magistrate Judge